This afternoon, that's McBride versus SCIHoutzdale. Who is it? Houtzdale? Houtzdale. I can tell you don't live in western Pennsylvania. Yeah, you got that right. Good afternoon. My name is Sarah Pontosky. I represent James McBride. I'd like to reserve five minutes for rebuttal. Very well. There are four points that we would like to discuss with the court today. The first is that the court has plenary review of the district court's decision to deny Mr. McBride's habeas petition. And it's not required to rely on findings of the state court on factual issues because Mr. McBride has presented clear and convincing evidence that many of those findings were incorrect. In addition, there was never a finding... But we would have to look at individual findings, including the finding that counsel had a strategy here. There was actually never a determination below as to whether there was... Counsel's performance was deficient, which goes to whether... I wasn't asking the ultimate question, only that he had a strategy, whether or not... Yes, today we need to look at whether he had a strategy, but there was never a decision at the state court proceedings as to whether he had a strategy. The state court actually... But there was a decision of the Superior Court, wasn't it? No, the Superior Court never made a decision as to whether he had a reason to... Let me take you through what the state court system did here because I'm a bit confused, ultimately, by what it meant. The common pleas court that tried the case was not the same common pleas judge who ruled on the PCR matter, is that right? Exactly. Judge Simpson tried the case, is that right? Yes. And who was the judge who ruled on the PCR matter? That I don't know off the top of my head, I apologize. It wasn't the same. It wasn't the same court. All right. The PCRA court did rule on the actual representation, the actual performance of trial counsel, am I correct? Yes. And therefore did not reach the second prong under Strickland. Yes, but the Superior Court... Hear me out. Hear me out. I'm getting to that. The case went to the Superior Court and the Superior Court says, well, wait a minute. The reasonableness of counsel's choice not to object presents a difficult question. To answer it, we must examine the entire record, nothing unusual about that, to determine whether counsel's decision had a reasonable strategic basis in the context of this trial. Then it goes on to say, the majority opinion, or the panel goes on to say, such being the case we will consider counsel's strategy together with the prejudice prong of ineffective assistance analysis. What does that mean? The Superior Court actually didn't consider the strategy. It only considered whether the strategy that wasn't even sure was there caused some sort of a prejudice. So it really only ruled on the prejudice. It seems that way on the last page of the opinion. Yes. But it presages that by suggesting that it was with language that suggests it's looking at both. The Superior Court decision I think is very clear that it only looked at the prejudice prong. I beg to differ on its clarity, but I think we agree on its ultimate import. So the Superior Court then rules on a completely separate prong of Strickland than the PCRA Court did. Yes. And then it went up to the District Court, and the District Court in the Eastern District of Pennsylvania on the habeas petition did not look at the prejudice issue. It only looked at the performance of the attorney. So we have plenary review. Why? You have plenary review because the District Court did not conduct any sort of evidentiary hearing below, and as a result you sit in the District Court's shoes. Sure. But don't we, after the Supreme Court's decision in Richter last year, aren't we in that particular doubly deferential zone where the question we have to ask is not the ultimate Strickland question, but whether the State Court was just completely off base in its view of the record in saying that Mr. McBride's counsel had a strategy, didn't fall below the standard required by Strickland? I mean, we've got this doubly deferential lens we've got to approach all this through, right? Yes. And so sitting in the same seat of the District Court, which would have to give deference to the State Court, what we were able to establish at the District Court proceedings is that the factual record that the State Court relied upon when it was making a prejudice determination was completely factually incorrect. There were three very key points the State Court relied upon that were never even presented. Some of them were never even presented at trial, and one was misconstrued. The first, a woman named Dawn DeLong, she never testified at trial, and her testimony was considered by the State Court. And the Superior Court treated her testimony as if it was offered at trial. Yes, it did. But it was only grand jury testimony. Yes, exactly. And then there was Judith Seagraves. The Superior Court said that Ms. Seagraves testified that Mr. McBride was moving a mattress outside of his house. However, Mr. McBride was in prison at that time, and that's undisputed, and Ms. Seagraves only testified that it was actually Mr. McBride's father that was moving the mattress out of the house. And then the third point is that there was testimony by two women, Annette Beck, who actually was in a relationship with Mr. McBride at one point in time, and a woman by the name of Denise Beckford, who was Ms. Beck's younger cousin. And both of them testified that Mr. McBride did say on occasion that he had killed his wife, but it was in a joking manner and in response to a girlfriend that nagged him over and over again. Is it not nonetheless significant that there was a mattress, that it contained the contour of a body, that it was soaked in blood, and that a witness saw it being moved by Mr. McBride's father and a landlord, and that there were two confessions? Well, there weren't two confessions. Well, there were two separate statements or admissions of having killed your wife in different circumstances, but to two different people. Well, the second confession could not have happened because Mr. McBride was also in jail at the time that that confession was made. Maybe it's a difference in the date, but that evidence was presented to the jury that there were two different confessions. I understand that the evidence was presented to the jury, but the second confession that came in, there was also evidence presented that it was impossible for that to have happened. That's fine. There's a credibility determination. In looking at the record, I might agree with you on the deficiency. May I issue, but I'm still looking at the prejudice because of all the other evidence that was presented. Sure, and let me speak to the mattress issue that you just raised. So Mr. McBride lived in a house that had other units in it, and it was open up top so that the attic connected the different units and so that people could move back and forth. In addition, that house was open all the time to parties. There were people in and out of it. There were other people living in the house. It was, for lack of a better word – These are circumstances that are presented to the jury. The point is that this testimony was presented to the jury, and there was, from what I can see, cumulative testimony pointing to McBride having been the killer. There wasn't. It was a different apartment's bloody mattress with a body in it, but the jury didn't have to buy that. If they heard about this, there was evidence there that was of some significance and weight. Wouldn't you agree? Oh, no, because it's not that it's insignificant, but it all goes to credibility, and it's all circumstantial. Because although there was a mattress found in that apartment, there was nothing linking Mr. McBride to that mattress. Who makes the credibility decision? The jury makes the credibility decision, but as the court has found in other instances, when there are violations, when there's ineffective assistance of counsel, and there's only evidence that turns on credibility, there's nothing linking someone to a crime, then because of that, there can be clear prejudice because there's ability for the jury to find a reasonable doubt. It's not all necessarily credibility because you have DNA evidence. The DNA evidence doesn't link Mr. McBride, though. It says that there was a mattress in a home that other people had access to with blood on it. That's all that says. There's no murder weapon. There's no body. Let me ask you if I can get you to shift gears just for a second here. The assertion by Mr. McBride's trial counsel was, this is what I was thinking. I was thinking it will help our case if people see that the police are just overbearing so-and-so's, that they never gave my client a chance. They were after him from the start. They really didn't investigate this. It was just a case of foregone conclusion with them. I thought that that would be a good thing for my client, for people to see the police in that light. That's why I didn't object when they started it. Now, you can say that's a load of codswallop or some other term you might want to use, but in the end, is it not within the realm of a deep deference for us to look and see if the trial, excuse me, if the state courts accepted that as a sound or at least an acceptable statement? Yes, there's... Strategy, that that's something we have to defer to? There's two problems with that strategy, which is why it should not be deferred to. The first is that that strategy would be like me saying the sky's yellow. I'm going to rely on the fact... First of all, you can see that there was a strategy, but we have to go beyond that. Right. Does the strategy have some reasonableness? The strategy has to be based on reasoned professional judgment. If I come up with a trial strategy, but it's based on the fact that the sky is yellow, and we obviously know the sky is blue. Where is the clear deficiency, then, in the articulated strategy? Sure, so the clear deficiency is that he did not understand that he had the ability to object to references to Mr. McBride's post-Miranda silences. That he didn't understand it, or that he didn't do it? No, he didn't understand that he had the ability to, and he didn't do it, both. Well, there's at least an ambiguity in the record on the first point, right? I mean, there's no ambiguity on the second point. He certainly didn't do it, but there's stuff in the record from which you could say, well, he did know it, and other stuff he says from which you would say, well, maybe he didn't know it. But would you agree it's ambiguous? I don't agree that that's ambiguous. In fact, and I'll read it to you. It said, in the second interview, Mr. McBride did not assert his Fifth Amendment rights from being silent. Mr. McBride answered questions. What I gathered from that, and what I felt the jury would gather from that, is that when it shifted from asking questions to becoming essentially accusatory towards Mr. McBride, that Mr. McBride wisely, first of all, had no response, eventually said this interview is over and stopped speaking. I did not believe that to be an improper comment on his assertion of a Fifth Amendment assertion. He went on to say, I'm not sure that it would be a successful motion under those circumstances. It wasn't Mr. McBride saying I choose not to answer because of a constitutional right or otherwise. It was Mr. McBride not responding. So I'm not certain that that was or would have been the subject of a proper constitutional challenge. But in any event, I didn't make one. In addition, at the PCR hearing, the prosecutor actually admitted that the trial counsel didn't think that he violated Mr. McBride's rights. The statement made was, Mr. Lauer stated that he did not think that infringed on Miranda rights or Fifth Amendment rights. Well, saying what the prosecutor said, the defense lawyer thought, doesn't get you very far. And I certainly agree that there are statements in the record from which you could say, ah, I'm not so sure this defense lawyer actually understood what was going on, which certainly causes one to be concerned about the state court ruling. But there are other statements in the record where he seems to indicate, no, I didn't want to object. I thought this was a good thing for my client. This was playing in, this was, I had him right where I wanted him. You know, that's sort of the pitch he seems to be making. But he couldn't make that decision if he didn't know he could object to begin with. And that's why there couldn't be any sort of a reasoned strategy. And in Boyer v. Patton, this court said that that same ambivalence was ineffective assistance of counsel. Boyer predates Richter, right? Yes. And Richter's pretty emphatic about, don't ask the Strickland question. You ask the 2254D question looking at Strickland. You've got to put both deferential lenses in place. Yes, but I think even with both deferential lenses in place, Boyer v. Patton is still good law in this instance. Ms. Pontosky, thank you very much. Thank you. We'll get you back on rebuttal. Mr. Morginelli. May it please the Court, my name is John Morginelli, District Attorney for Northampton County, representing the respondents in this case. Your Honor, I'd like to, if I may, get right to the meat of this argument, which I think is the point that the Court's focused on in the argument that's been made by the petitioner, and that is somehow that Mr. Lauer did not know the law. It's absolutely not accurate because you have to look at this case from the beginning, okay? Show us where it is. Like your colleague on the other side just gave us a quote indicating he didn't know the law. Okay. What can you point us to in the record that shows, well, maybe he did know the law and he was making a choice? Okay. I'm going to argue two points on that if I may get my notes out on that. First of all, in pretrial, the defense counsel, and this is not mentioned in a brief because as we started to prepare for this oral argument yesterday, in pretrial he files a motion to suppress the statements. And I brought it along, and I'm going to ask permission to file a letter of brief to add to it. It's in the record, but it wasn't argued. He files a motion to suppress statements. And in paragraph 7 of his motion he states, petitioner indicated during questioning on several occasions by words and actions, a desire to terminate the questioning process and consult with an attorney. Notwithstanding these facts, the questioning continued and petitioner allegedly made certain incriminating statements thereafter. So pretrial he filed. How did this escape anybody's notice until right now? Well, Your Honor. As you're leading with it, I guess you would agree it's pretty dang significant, isn't it? I think so, Your Honor, and obviously. It's nicer than I am. I'd say pretty damn significant. It is significant. It is significant that these motions were filed. And I've tried this case myself. However, the PCRA hearing was handled by an assistant DA. And so now he's gone and I'm back on this case again. But it is in the record because it's part of the court, you know, But he did file a pretrial motion to suppress all statements and make specific reference to words and actions. Now that motion is denied by the trial court. So the attorney, Lauer, now going to trial, has to deal with the pretrial motion on all the statements are not suppressed. And in his opening statement then develops a trial strategy, which is consistent with this defendant's conduct over 16 years. Remember, Mrs. McBride left this face of the earth in 1984, and this case was tried in 2001 after a grand jury looked at this case. But now Lauer is faced with this suppression order, and he adopts a strategy which he outlines before one witness is called. In his opening statement, which I made statements verbatim in my brief, he says what he's going to do. He says, we're going to have my client testify. My client's going to tell you from day one that he cooperated with the police, that he told him everything he knows, and he goes into his strategy in opening statement before one witness is called. Let me ask, if I can, Mr. Morganelli, why, well, I have two questions. First, why make this an issue? Why, what was, and maybe this is just academic on my part, but what was the purpose in asking, and you were the trial counsel, what was the purpose in asking questions that went to the Fifth Amendment right to remain silent? Because you did ask and got answers to those questions. There wasn't an objection, and the trial court let it roll, but you know what the Fifth Amendment says. What was the thinking to expose the system to that kind of a risk of a Fifth Amendment violation overturning all the good hard work that you, your office, the police, everybody else was trying to do? Well, there's two things, Your Honor. First of all, leading up to the trial, there's lots of discussions that go on, and I've been, the 20 years, tried a lot of murder cases with the defense counsel. And after these motions were denied, they adopted a strategy, which, you know, we sort of talked about what's going to happen at trial. I knew that the defendant was going to testify. Mr. Lauer tries a lot of cases. He's a 30-year experienced trial lawyer in Northampton County. And in order to get the case in, rather than redacting statements, because I felt that it was a, the first statement given to Fritz was a voluntary statement where McBride comes in voluntarily and tells him what he knows. Why not redact the statement? Because Lauer is telling us that he's going to, he wants it all in. Wait, wait, wait, wait a minute, though. Maybe, maybe he did. But following up on Judge Jordan's question, what I don't understand is why do you need the Q&A? If the strategy is to demonstrate that the police and investigators had tunnel vision, that all they wanted to do was look at McBride, to the exclusion of every other possible suspect, why isn't it probative enough simply to demonstrate the fact of the questioning, rather than the particular questions and answers themselves, which in part to me seem pretty damning, especially where someone says, I don't want to talk on taping. It's an excellent question, Judge Smith. I can't answer it because it's just the way it went in. It went in because the understanding was that this was going to be the defense, that the defendant was going to testify, and rather than have him get up there, he wanted, to my knowledge, based on my recollection of the case, and we're going back to 2001 now, and as he's testified at trial, and as he said in his opening statement, once he laid it out in his opening, all this was coming in, and it was just a matter of getting it in the record, and that he was going to then use it on cross-examination to show how McBride was willing to answer questions, and sometimes he didn't have the answers to them, he didn't know, but none of this was inculpatory, Judge. I mean, we're talking about exculpatory, a voluntary interview, and no inculpatory statements made by this defendant. Not once did he ever deny his guilt, admit his guilt, I should say. Isn't this compounded by the fact that the judge instructed the jury, specifically told the jury that listen to this statement, and you can gauge Mr. McBride's reactions from the statement that you're about to hear. In other words, he was silent, and basically he's telling the jury, look, a person who is accused of such serious offenses would normally not be silent. I think to answer, yes, it was compounded, in the sense there was a hearsay objection, which was sort of startling. I didn't understand the hearsay objection. I don't understand the ruling either. Well, I can't answer that, Judge. I'm not the judge, but let's get back to what I think is the... But you were there in the courtroom, and it leads me to the second thing I wanted to ask. How could the Superior Court, and I don't mean to cast any aspersions, but they're just gigantically wrong about what happened at trial. I mean, how can...what are we supposed to do with that? Well, Judge, what they were...the only gigantic fact... They think stuff happened at trial. It just didn't happen at trial. But other than that... We cleared that up. We tried to clear it up. I mean, what happened... That's not the opinion. No, no, I know it is, Judge. I know it is. But that issue of whether this...that lady testified at a preliminary hearing. She testified at a preliminary hearing that she saw McBride and his wife doing something and that she was injured. But she wasn't...she did not testify at trial. But really, that error by the Superior Court, and it wasn't... Or was it evidence from the preliminary hearing that the Commonwealth tried to get in at trial, which you're permitted to do under certain circumstances of unavailability. That's true, but we didn't... It has completely dehorsed the record. That's correct, Judge. But for the purpose of why we're here today, though, because we've been through this in the state courts, and the Supreme Court of Pennsylvania was aware of that error when they denied Alicata in this case. They were aware of it because we cleared it up as soon as that opinion came out and notified the Superior Court of it as well. But it didn't change anything in terms of the fact that there was a finding that Mr. Lauer was not ineffective because he's not ineffective because this is his trial strategy to put all this stuff in, and that was the crux of the issue. That issue where they made reference to DeLong's testimony had nothing to do with what the court was deciding in terms of ineffective assistance. Can you have a strategy that is so bad that it can compromise the fairness of the proceeding? You can, Judge, but this is really the strategy that McBride was doing for 16 years because his strategy from day one was that he was cooperating. Oh, my wife left with so-and-so. Someone saw her here, which was all not true, but this was what McBride wanted. He wanted to testify. I'm talking about the strategy in the courtroom and presenting that statement, including the non-responses by McBride. But, Judge, if the strategy is to show that your client is willing to talk to the police, that he went there as a good-faith husband trying to help and to show that the police wouldn't look anywhere else and they were trying to basically frame Mr. McBride, because that's essentially the theory, and frame-up defenses are out there and they're recognized as good arguments. What other defense did McBride have? Remember, this case was 16, 17 years after her disappearance. McBride was living in Florida under a different name, soon name. He had made these admissions to friends, some say in a joking manner. Oh, he was joking that he disposed of his wife's body somewhere. Well, I don't know who does joke. And he explained all that to the jury, McBride, and they heard his testimony and they heard his explanations for his statements in terms of these lay witnesses. But the bottom line, Judge, is that as a trial lawyer, when Lauer is going to trial, what's he going to do? Not put his guy on the witness stand and let this evidence come in? Or McBride says, I want to take the stand and tell my side, because for 16 years I've been imploring the police to look around for somebody else and find my wife who disappeared. I mean, it is a strategy that is not unreasonable. The district court, let's forget about the state courts, this federal district court found it to be that they didn't even get to the Strickland test, that if Lauer is claiming, as he has in his PCRA, and to follow up the question that Judge Jordan asked me, in my brief I make specific references to Mr. Lauer's PCRA testimony to show that he did know the law. You know, it's easy to take something out of context, but the question on page 275 of the record, questioned by Mr. Andrews, Mr. Lauer, would you agree that the testimony at the least refers to post-Miranda silence? The question was whether it violated my client's constitutional Fifth Amendment rights. This question is solely limited to whether at least it referred to post-Miranda. Answered by Lauer, I believe it is a reference to post-Miranda silence, clearly. Question, and the reason, so I understand your answer, the reason you did not object, you didn't request a mistrial or any instructions, was that you thought that the benefit to the defense was you were showing what type of investigation it was, that it was out to turn Mr. McBride into a suspect, when they had no reason to suspect him. Answer, yeah, I believe, and I think was part of the theory of the defense, that the prosecution hadn't really looked much further than James McBride ever, and this was a matter of some three months after Kelly's disappearance. I mean, I don't know how to do this except by referring to the cross-examination of Agent Fritz. I mean, this is what Lauer did. And McBride, you know, he had been advised he has a right to testify or not testify. He knew that, and he chose to testify and tell this story. And now here we are 29 years later after the disappearance and death of Mrs. McBride that we're going to say that this strategy was unreasonable and give him a new trial. What are we to look at, just as a matter of law here, if the trial court rules on, I mean the PCRA trial court. I'm sorry. The PCRA court says not deficient performance, and the Superior Court says no prejudice. Does that matter that the Superior Court took a different view of how to analyze it and that it really didn't look at the strategy? I mean, it said it was going to, but it didn't. It ruled on the basis of no prejudice and on an erroneous understanding of what was in the trial record. Does that matter or should it matter to us that the Superior Court took a different route? Well, I don't concede that they took a different route because, in my view, it's a two-pronged test. And just like the Federal District Court judge did when he ruled that he found no deficient performance, I don't have to get to the other test. So you can assume, I guess, perhaps that the Superior Court, for whatever reasons, either considered it and maybe they didn't say. As Judge Smith pointed out, we don't know for sure. What about the fact that they relied on testimony they should not have at all considered? They did do that. The Superior Court did do that in terms of the long testimony, which was not at trial, in analyzing the prejudice test. Is its conclusion so deficient then that we have to look at this differently? I don't think so, Judge. I think that the fact is that the Pennsylvania Supreme Court was aware of that and it didn't change the outcome in terms of them taking this case up on that basis. Nevertheless, I understand the argument that you can go back to perhaps if you decide that and not give deference to, though, that factual finding. But what we're focused on here is, I believe, as the certificate of appealability was limited in scope, to the issue of whether or not there was deficient strategy here. The district court judge found it not to be and didn't reach the prejudice prong. Well, is there anything to prevent us from reaching the prejudice prong? Well, Judge, you're the judge. You can do whatever you want, I think. But legally, I'd assume that you could probably find a rational way to get to that point. I don't think that you should. I don't think that it's the right way to go in terms of looking at this case because I think the federal district court judge got it right. He looked at this and he said, listen, the case law is clear. Lawyers can allow references to silence in. And you've got to remember, Judge, these were voluntary interviews prior to his arrest. In fact, it was 16 years prior to his arrest we're talking about. In non-custodial situations, the first one and the second one, he was incarcerated but on unrelated charges that he agreed to speak to the police and only answered 90% of the questions essentially and never ever made any type of inculpatory statement. So Lawyer's view is, hey, I want to show how he cooperated. He never admitted any guilt. There's no harm here. It's consistent with what he's been saying for 16 years. And what else other defense are they going to argue? We're not talking about insanity. We have to cut you off if you finish your sentence. Okay. I'm good. I'm good, Your Honor. Thank you. Thank you, Mr. Morginelli. Ms. Montosky. Mr. Morginelli made several references to all this testimony not being while Ms. McBride was in custody. The first set of references are from a May 30th, 1984 interrogation in which he was imprisoned in Lehigh County Prison for other offenses. However, under Pennsylvania law, that's enough for someone to be in custody. Every Pennsylvania court to consider this found that and the district court found that as well. The test under Pennsylvania law is a suspect is in custody for the purposes of a Miranda analysis. If he is physically deprived of his freedom in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by such an interrogation. Okay. Let's accept all that for the sake of discussion and ask you if you would please to answer the very first point raised by Mr. Morginelli, which I understand to be trial counsel did understand and there's evidence in the record showing he understood the Fifth Amendment and its import. So, this was not a case of he didn't get it. He got it. He made a deliberate decision to allow it all in because he thought it was going to work out best. So, I understand that you might be focusing for the first time in this courtroom on this pretrial motion as now we are hearing it for the first time here. But if that's in the record and it goes with other things that were in the briefing, how can we second guess the decision of the state courts in determining that whether that's a smart strategy or not, it's still a strategy and it's entitled to broad deference under Strickland? Sure. Well, two things. First of all, unlike Mr. Morginelli, I didn't have the benefit of being present at that trial. So, we would like the opportunity to take a very in-depth look at that motion and have the ability to respond to it at that time. But regardless, the type of strategy that he came up with was not reasoned. And on top of that, the court's ruling… Help me with that before you go. How is it not reasoned? You may say it's not a very, you know, you don't think it's a very clever strategy, but is it not at least reasoned in the sense of a logical person could say, hey, maybe if I show how much I cooperated and that they were just after me from the start, that that might work out for me. Is that on its face frivolous and unreasonable? By including references to post-Miranda silences and having that strategy, yes. There's no reason why you couldn't have that strategy and do it without those references. So, what we're doing is talking about a difference between strategy and tactics. I mean, the strategy itself may be perfectly reasonable. No, it's not perfectly reasonable because it's not based on reasoned professional judgment. Well, now you're going back to something that we've tried to, like, take out of the discussion for a moment. Assume that he knew, okay? Assume he did know and he made a reasoned professional judgment that he was going to let this go. Are we down to tactics? No, I don't think so. I think you're still at the strategy stage, and I don't think that he knew. In addition, I think that the court in this instance, the court made the entire thing even worse with the instruction that it gave to tell the jury to focus in on Mr. McBride's reaction to everything, and he didn't object to that either. And why would you not object to that? He could still have the strategy that he had if it was a strategy and it was reasoned, and he could still object to that instruction by the court. In fact, he could have asked for a limiting instruction by the court. Can you say, if we were to agree with you that counsel was deficient, that but for that deficiency the jury would have acquitted Mr. McBride? Yes, I think that you can because this is all based on circumstantial evidence. At any tip of the scale in any direction, there could have been a different decision. And that's what the court found in Kahn versus Drafts, and that's why it found prejudice. Any tip of the scale in such a situation as this, there's nothing connecting Mr. McBride to this murder. There is a case that's out of the Fifth Circuit, and I don't have the name of it right now, but it basically says that a defendant shouldn't have it both ways. Speak when you want to speak and be silent at specific moments and then speak when you want to speak. At some point at post-morandum, you have to say, I'm invoking my right to remain silent. But Mr. McBride wants it both ways, doesn't he? Well, Mr. McBride actually did invoke his right to remain silent, and a reference to that was brought in. He terminated the interview, and a reference was made to that as well. Okay. Red light is on. Mr. Morganelli, you made a reference to a document that is not available, made available to us or to Ms. Pontosky. Yes, would you please be a 28-J letter, file it with the clerk of the court and copy to counsel? And we would like the opportunity to make a response on it. All right. We want to make this in short order, though. Can you get it to us in five days, within five days? Yeah, I can, yes, sir. Five days to respond? Yes. Thank you. Sounds good. Thank you. Okay.